IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERCIA )<br>)<br>v. )<br>)<br>BRIAN PAUL ABEL, )<br>)<br>Defendant. ) | Case No. 1:20-mj-218 |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT

I, Thomas R. Hanula, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.  I am a Detective with the Arlington County Police Department (ACPD) and have been so employed since 1988. I am currently assigned to Enforcement Group Forty-Two at the Washington Division Office, located in the District of Columbia, as a Task Force Officer.

2.  While with the DEA and ACPD, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers and money launderers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial

documents and records.

3. This affidavit is being submitted in support of a criminal complaint charging BRIAN PAUL ABEL ("ABEL") with conspiracy to distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

6. During the course of this investigation, investigators have used four (4) cooperating sources (hereinafter, "CS-1" through "CS-4"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

## PROBABLE CAUSE

A. <u>Background of the Investigation</u>

11. In or around 2018, law enforcement learned that a group of individuals were

distributing large quantities of methamphetamine throughout the Washington, D.C. Metropolitan area.  This group utilized, and often shared, sources of supply for multiple-ounce quantities, and at times multiple pounds, of methamphetamine, which they further distributed to customers throughout the Washington D.C. Metropolitan area, including in the Eastern District of Virginia.  Law enforcement also learned that these individuals utilized various mailing services (*e.g.* USPS, UPS, DHL, FedEx) to ship methamphetamine to the Eastern District of Virginia and elsewhere.  Law enforcement also learned that these individuals traveled to New York and elsewhere to obtain large quantities of methamphetamine, which they brought back to the Washington, D.C. Metropolitan Area for further distribution.  Law enforcement identified BRIAN PAUL ABEL ("ABEL") as part of this group.

  B. <u>Law Enforcement seizure of approximately two (2) pounds of methamphetamine in Arlington, Virginia on September 8, 2018</u>

  12. On or about September 8, 2018, law enforcement intercepted a FedEx package mailed from a location in California to CS-1 at a Homewood Suites, located on North Quinn Street in Arlington, Virginia.  The package entered the Eastern District of Virginia through Dulles International Airport.  Thereafter, law enforcement conducted a controlled delivery of the package, resulting in an encounter with CS-1 after he attempted to obtain the package.  CS-1 agreed to cooperate with law enforcement, and consented to a search of the FedEx package, resulting in the discovery of approximately two (2) pounds of suspected methamphetamine.  Laboratory analysis confirmed the substance inside the package was approximately 885 grams of methamphetamine.

  C. <u>Historical Information provided by Confidential Source 1 (CS-1)</u>

  13. CS-1 began cooperating with law enforcement in 2018.  CS-1 is an admitted drug

user and has a prior larceny conviction.  CS-1 is cooperating with law enforcement in hopes of receiving a reduced sentence after pleading guilty to a federal drug trafficking charge in 2019 in the Eastern District of Virginia.  CS-1 received a 120-month sentence in connection with his plea.  CS-1 has provided information to law enforcement that has been independently corroborated.  CS-1's information has led to the conviction of co-conspirators. Based on the forgoing I consider CS-1 reliable.

14. During an interview with law enforcement, CS-1 admitted to importing multiple pounds of methamphetamine from California for further distribution in the Eastern District of Virginia and elsewhere.  Specifically, CS-1 admitted to distributing methamphetamine to several customers in this area, including ABEL, who routinely purchased between one (1) to two (2) pounds of the drug.

15. CS-1 told law enforcement that, in or around late 2017, he met ABEL on a dating application called "Grindr".  After the initial meeting, ABEL began to purchase ounce quantities of methamphetamine from CS-1 on a weekly basis until roughly the beginning of 2018.  CS-1 admitted that one (1) of the two (2) pounds seized by law enforcement in September 2018 was intended to for ABEL, and that ABEL gave CS-1 approximately $4,000 towards the purchase in the days leading up to the controlled delivery.  CS-1 said that, between in or about May 2018 and September 2018, CS-1 supplied ABEL with approximately one (1) pound of methamphetamine on an almost weekly basis.

16. CS-1 advised that he frequently met with ABEL at his (ABEL's) residence at 1234 Massachusetts Avenue, Apartment #709, Washington, D.C. to conduct methamphetamine transactions.  CS-1 stated that ABEL utilized cellular phone number 240-817-8795 to contact him.

17. Based on his conversations with ABEL, CS-1 knew that ABEL had additional sources of supply in New York for large quantities of methamphetamine.  CS-1 was aware that ABEL made frequent trips to New York, and said ABEL had an "assistant" who rented his vehicles and booked his hotels.

D.     Communications between CS-1 and ABEL

18. CS-1 consented to a search of his cellular telephones, resulting in the discovery of communications, including drug-related communications, between CS-1 and ABEL.  The following table contains communications between CS-1 and ABEL, who was utilizing telephone number 240-817-8795 at that time, regarding the purchase of methamphetamine.

19. On July 13, 2018, CS-1 and ABEL exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 7/13/18 | ABEL | Muy mal but whatever I need half a hour of your company later |
| 7/13/18 | CS-1 | Okay, no prob.  Just let me know what time so I can set aside those 30min |
| 7/13/18 | ABEL | Will do sir…if you have any CHUNKie women I'd Love to have as much of her As possible if you can manage my friend |
| 7/13/18 | CS-1 | Are you talking about the healthier looking woman is what you want and not the rest I should shake them? |
| 7/13/18 | ABEL | Yes sir I shook out one last week sitting my and she needed up to be 72 miles away |
| 7/13/18 | ABEL | Ended not needed |
| 7/13/18 | CS-1 | Huh?  Now I lost me lol.  So later today for halfer of an hour?  Right? |
| 7/13/18 | ABEL | Yes sir big pieces if possible |
| 7/13/18 | ABEL | I have 72 gs of power rn |
| 7/13/18 | CS-1 | Okay I understand I'll get you the chunkiest I can get |

20. Through my knowledge of this investigation and discussions with CS-1, I know that

"half a hour" and "set[ting] aside those 30 min," were references to one-half pound quantities of methamphetamine. I also believe that ABEL's reference to having seventy-two (72) grams of "power" was a reference to methamphetamine, and that he was asking to purchase "chunks." Based on my training and experience, I know that "chunks" means to methamphetamine that has not been pulverized, which could allow it to be diluted with cutting agents.

21. On July 21, 2018, CS-1 and ABEL exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/21/18 | ABEL | Can you get that whole on delivered |
| 7/21/18 | CS-1 | Yea, but it will be delivered first thing Tuesday morning. Sunday there's not shipping it would have to go out Monday for Tuesday delivery first thing in the mo |
| 7/21/18 | ABEL | Lol so your completely out? |
| 7/21/18 | CS-1 | Yea, why? |
| 7/21/18 | ABEL | Cause I'm almost out |
| 7/21/18 | ABEL | I have s plan b around |
| 7/21/18 | CS-1 | What's that m? |
| 7/21/18 | CS-1 | No plan b just wait on me :) |

22. Through my knowledge of this investigation and discussions with CS-1, I know that when ABEL wrote "Can you get that whole on delivered," he wanted to know when a whole pound of methamphetamine would be delivered to CS-1. Additionally, ABEL wrote "Cause I'm almost out," indicating that he was almost out of methamphetamine. In all, ABEL indicated he was waiting for methamphetamine to be shipped to CS-1 so that he could buy more. I also believe that ABEL's reference to having a "plan b" was code meaning that he had another methamphetamine source of supply.

23. Between July 25, 2018 and July 27, 2018, ABEL and CS-1 exchanged the following messages:

6

| DATE | FROM | MESSAGE |
|---|---|---|
| 7/25/18 | CS-1 | Yea I forgot I got to check out of my hotel. Thank you. Sorry for being a day late and thanks you for waiting on me and sorry for the presentation of the product. It won't be like that again. |
| 7/25/18 | ABEL | Ite all goo aye man every batch can't be perfect. And I cant' complain cause idk how to cook it Or my crazy ass probably would. |
| 7/26/18 | ABEL | So [CS-1] is there anyway possible or you do you willing to take back I have a pound of this. Please. With sugar on top. |
| 7/26/18 | ABEL | If not I totally get it |
| 7/26/18 | ABEL | A half** |
| 7/26/18 | CS-1 | Take back? Like switch out? |
| 7/26/18 | ABEL | Welllllll.yea |
| 7/26/18 | CS-1 | Yea I can do that |
| 7/26/18 | CS-1 | I don't get new stuff till tomorrow |
| 7/26/18 | ABEL | Awesome so Friday? |
| 7/26/18 | CS-1 | Yup |
| 7/26/18 | ABEL | And I may be able to buy another half with that |
| 7/26/18 | ABEL | And I have Only a quarter to five back |
| 7/26/18 | ABEL | Give |
| 7/27/18 | ABEL | Please lmk the deal Incase I have to run to ny |
| 7/27/18 | CS-1 | How much are you gonna want to trade out then how much are you going to want to get |
| 7/27/18 | CS-1 | Let me know so I can Harvey it ready please |

| 7/27/18 | ABEL | ¼ and I want a whole |
| --- | --- | --- |
| 7/27/18 | ABEL | All together a lb |
| 7/27/18 | CS-1 | So you want to get 12 oz and trade me 4 oz of yesterday for 4 oz of what came today leaving here with a total of 1 right? |
| 7/27/18 | ABEL | Yes |

24. Through my knowledge of this investigation and discussions with CS-1, I know that when ABEL wrote "So [CS-1] is there anyway possible or you do you willing to take back I have a pound of this. Please. With sugar on top" he was asking to return or trade in methamphetamine of poor quality that ABEL had previously obtained from CS-1. I also believe that ABEL indicated that he wanted to make an additional purchase, for a total weight one (1) pound of methamphetamine: "All together a lb."

25. On September 6, 2018, CS-1 and ABEL exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 9/6/18 | ABEL | So the whole reason I came to nyc was a fail…so we need to speak about what needs to happen to get things in motion with Natalie |
| 9/6/18 | CS-1 | Yea. I'm gonna have to wait for a redelivery for tomorrow because the package isn't under a difference name so they have a redelivery scheduled for the morning |

26. Through my knowledge of this investigation and discussions with CS-1, I know that ABEL and CS-1 were discussing the shipment of 885 grams of methamphetamine that was ultimately seized by law enforcement in Arlington, Virginia on or about September 8, 2018.

E.     Communication between Kendesia May and Abel

27. CS-1 told law enforcement that, in approximately January 2018, CS-1 sold his phone containing contact information for his methamphetamine customers in the Washington Metropolitan Area to Kendesia MAY for approximately $25,000. In March 2019, MAY was convicted in the Eastern District of Virginia for conspiracy to distribute controlled substances, to wit: 50 grams or more of methamphetamine, and 500 grams or more of a mixture and substance containing methamphetamine. MAY was sentenced to 168 months' confinement and was ordered to forfeit $500,000. Prior to his conviction, MAY received shipments of methamphetamine in New York and Washington, D.C. from CS-1 and CS-1's co-conspirator. As discussed herein, law enforcement has determined that, between approximately January 2018 and May 25, 2018, MAY supplied ABEL with large quantities of methamphetamine.

28. On May 25, 2018, law enforcement stopped MAY in Baltimore, Maryland and seized approximately five (5) pounds of methamphetamine. Law enforcement subsequently executed a federal search warrant for information associated with MAY's iCloud accounts, which included information stored by Apple associated with MAY's cellular phone, which had assigned call number 646-247-6821. Upon receipt of MAY's communications, law enforcement conducted a review of the information and identified multiple communications between MAY and ABEL discussing suspected narcotics transactions.

29. On February 5, 2018, MAY and ABEL exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 2/5/18 | ABEL | Need full name and address that should be it. Itll be send at cash pickup. |
| 2/5/18 | MAY | Francisco Acosta 774 e 225 st Bronx ny 10466 |
| 2/5/18 | ABEL | May need to pick up tonight..will one of your ppls do a whole |
| 2/5/18 | MAY | Yes |

30. Through my knowledge of this investigation and discussions with CS-1, I believe that in the above conversation ABEL was discussing sending money to MAY to purchase a quantity of methamphetamine. Further, review of MAY's iCloud content yielded a Western Union receipt dated February 5, 2018, for $500 from ABEL to "Francisco Acosta", who is named in the text message. Based on my participation in this investigation, I know Francisco Acosta assisted MAY in his drug trafficking activities.

31. On February 17, 2018, ABEL and MAY exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 2/17/18 | MAY | Yeah I'm headed there no you good on product right |
| 2/17/18 | ABEL | No I needed another qp |
| 2/17/18 | ABEL | I mean I have some but wanted to make sure im stocked up for when you leave |

32. Based on my knowledge of this investigation, and my training and experience, I believe ABEL was talking about purchasing additional methamphetamine from MAY. "QP" is a common drug slang term or abbreviation for a quarter pound; here, a quarter pound of methamphetamine.

33. Between April 18, 2018 and April 20, 2018, ABEL and MAY exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 4/18/18 | ABEL | Still doing 4 for the half |
| 4/20/18 | ABEL | How much for a whole one |
| 4/20/18 | ABEL | 68? |

34. Through my knowledge of this investigation and discussions with CS-1, I believe

ABEL was discussing a potential purchase of a half-pound quantity of methamphetamine for $4,000, as well as a one (1) pound quantity of methamphetamine from MAY for $6,800.

35. Between May 17, 2018 and May 25, 2018, ABEL and MAY exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 5/17/18 | MAY | U good this week |
| 5/17/18 | ABEL | Nah ims grab something |
| 5/17/18 | ABEL | Probably a half |
| 5/25/18 | ABEL | Y we're u in town today |
| 5/25/18 | MAY | Tomorrow |

36. Through my knowledge of this investigation and discussions with CS-1, I believe ABEL was checking to see if MAY was bringing methamphetamine from New York to the Washington, D.C. area. The last communication took place on the date of the seizure of approximately five (5) pounds of methamphetamine from MAY.

F. Historical Information provided by CS-2

37. CS-2 began cooperating with law enforcement in 2019. CS-2 is an admitted drug user with no prior criminal history. CS-2 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a drug trafficking charge in the District of Columbia. CS-2 has not yet been sentence in connection with his plea. CS-2 has provided information to law enforcement that has been independently corroborated. Based on the forgoing I consider CS-2 reliable.

38. In and around 2018, law enforcement arrested CS-2 on federal drug trafficking charges in Washington, D.C. When CS-2 was arrested, he consented to law enforcement

downloading the contents of his cellular telephone. Law enforcement reviewed the phone download and found the number 240-817-8795 stored with the contact name "Brian Baltimore"; CS-2 identified this phone number as ABEL's. CS-2 told law enforcement that he met ABEL through a mutual friend in or about late 2017 or 2018. Additionally, CS-2 stated that, in and around 2018, CS-2 purchased one (1) ounce quantities of methamphetamine from ABEL on at least two (2) occasions, and one-half (1/2) ounce quantities of methamphetamine on at least two (2) occasions. CS-2 also told law enforcement that in and around 2018 CS-2 observed ABEL with approximately two (2) pounds of methamphetamine in his apartment at 1234 Massachusetts Avenue in Washington, D.C.

    G.    Historical Information provided by CS-3

39. CS-3 began cooperating with law enforcement in 2019. CS-3 is an admitted drug user with no prior criminal history. CS-3 is cooperating with law enforcement for financial compensation and has made statements against his own penal interest. CS-3 has provided information to law enforcement that has been independently corroborated. CS-3's information has led to the arrest of other drug traffickers. CS-3 has recently self-reported to law enforcement to using methamphetamine. CS-3 stated that he had lost his job due to Covid-19 and suffered extreme depression, which led to his use. Based on the forgoing I consider CS-3 reliable.

40. In or about 2019, CS-3 was approached by law enforcement after his phone number appeared in call detail records for 202-568-5598: another phone number determined by law enforcement as used ABEL.[1] CS-3 agreed to provide law enforcement with information

---

[1] Through an administrative subpoena, law enforcement determined that this number was subscribed to by ABEL at an address in Baltimore, Maryland.

regarding his knowledge of the methamphetamine trafficking activities of ABEL and others.

41. CS-3 told law enforcement that in and around the summer of 2019, he purchased approximately two (2) ounce quantities of methamphetamine from ABEL on at least two (2) occasions. According to CS-3, ABEL often used an end-to-end encrypted messaging application called "Signal" to send messages related to drug trafficking, including photos of methamphetamine. Additionally, CS-3 said that ABEL had "advertised" through phone messages that he had clear and amber-colored methamphetamine for sale.

H.    Controlled Purchase of methamphetamine on June 5, 2019

42. On or about June 5, 2019, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of a quantity of suspected methamphetamine from ABEL in Washington, D.C. CS-3 arranged this purchase by communicating with ABEL via text messages. Prior to, and following, the controlled purchase, CS-3 was searched for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location. During this surveillance, law enforcement observed ABEL meet with CS-3 in the garage of his building at 1234 Massachusetts Avenue, Washington, D.C. According to CS-3, ABEL provided him with a quantity of suspected methamphetamine, which CS-3 subsequently provided to law enforcement. The controlled purchase was recorded, and I can confirm the recording corroborates CS-3's debrief to law enforcement regarding the transaction. A field test of the substance confirmed the presence of methamphetamine. Laboratory testing of the substance confirmed that it had a net weight of 55.86 grams of which 55.30 grams was actual methamphetamine.

I. <u>Historical Information provided by CS-4</u>

43. CS-4 began cooperating with law enforcement in 2019. CS-4 is an admitted drug user with has no prior criminal history. CS-4 is cooperating with law enforcement in lieu of facing a potential federal drug trafficking charge. CS-4 has provided information to law enforcement that has been independently corroborated. Based on the forgoing I consider CS-4 reliable.

44. In or about 2019, law enforcement approached CS-4 to discuss certain money transfer activity believed to be associated with methamphetamine trafficking. During this interview, CS-4 confirmed to law enforcement that he purchased methamphetamine from ABEL. CS-4 admitted that he met ABEL in and around 2018 and began to purchase one-half (1/2) and one (1) ounce quantities of methamphetamine from him on an almost weekly basis. CS-4 said he usually met ABEL at his residence at 1234 Massachusetts Avenue #709, Washington, D.C., but that on at least one (1) occasion ABEL delivered methamphetamine to him in Arlington, Virginia.

45. CS-4 stated he knew that ABEL utilized rental vehicles, bus services, and Amtrak trains to travel to New York to obtain large quantities of methamphetamine. In or about June 2019, CS-4 said he was present when ABEL returned from such a trip to New York and saw him in possession of approximately two (2) pounds of suspected methamphetamine. CS-4 also stated he knew that ABEL had previously purchased methamphetamine from CS-1. CS-4 told law enforcement that ABEL utilized cellular phone number 202-568-5598.

J. <u>Controlled purchase of methamphetamine on September 30, 2019</u>

46. On or about September 30, 2019, under the direction and supervision of law enforcement, CS-4 made a controlled purchase of a quantity of suspected crystal

methamphetamine from ABEL in Alexandria, Virginia. CS-4 arranged this purchase by communicating with ABEL via text messages. Prior to, and following, the controlled purchase, CS-4 was searched for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location, and observed ABEL meet with CS-4 inside a business in Alexandria, Virginia. According to CS-4, ABEL provided him with the suspected methamphetamine, which he subsequently turned over to law enforcement. This controlled purchase was recorded, and I can confirm the recording corroborates CS-4's debrief to law enforcement regarding the transaction. A field test of the substance confirmed the presence of methamphetamine. Laboratory testing of the substance confirmed it had a net weight of 54.40 grams all of which was actual methamphetamine.

    K.    <u>Controlled purchase of methamphetamine on February 7, 2020</u>

    47.    On or about February 7, 2020, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of a quantity of suspected crystal methamphetamine from ABEL in Washington, D.C. CS-3 arranged this purchase by communicating with ABEL via text messages on Signal using the SUBJECT TELEPHONE NUMBER. Prior to, and following, the controlled purchase, CS-3 was searched for contraband with negative results. Prior to the transaction, law enforcement conducted surveillance and observed ABEL exiting 1234 Massachusetts Avenue NW, Apartment #709, Washington, D.C. Law enforcement conducted surveillance of the arranged meeting location, and observed ABEL meet with CS-3 inside of a business in Washington, D.C. According to CS-3, ABEL provided him with the suspected methamphetamine, which CS-3 subsequently turned over to law enforcement. This controlled purchase was recorded, and I can confirm the recording corroborates CS-3's debrief to law enforcement regarding the transaction. A field test of the

substance confirmed the presence of methamphetamine. The suspected methamphetamine recovered during the controlled purchase weighed approximately two (2) ounces.

      L.      <u>Controlled purchase of methamphetamine on April 15, 2020</u>

      48.      On or about April 15, 2020, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of a quantity of suspected crystal methamphetamine from ABEL in Washington, D.C. CS-3 arranged this purchase by communicating with ABEL via text messages on Signal. Prior to, and following, the controlled purchase, CS-3 was searched for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location, and observed ABEL meet with CS-3 in Washington, D.C. According to CS-3, ABEL provided him with the suspected methamphetamine, which CS-3 subsequently turned over to law enforcement. This controlled purchase was recorded, and I can confirm the recording corroborates CS-3's debrief to law enforcement regarding the transaction. A field test of the substance confirmed the presence of methamphetamine. Laboratory testing of the substance confirmed that it had a net weight of 84.544 grams of which 83.698 grams was actual methamphetamine.

## CONCLUSION

      49.      Based upon the foregoing, I believe probable cause exists to demonstrate that from in and around the end of 2017 to present, within the Eastern District of Virginia and elsewhere, BRIAN PAUL ABEL, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully,

knowingly, and intentionally distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Respectfully submitted,

_____
Thomas R. Hanula
Taskforce Officer (TFO)
Drug Enforcement Administration

Respectfully submitted and attested to in accordance with
Fed. R. Crim. Proc. 4.1 by telephone on July 31, 2020.

_____
Digitally signed by Michael S. Nachmanoff
Date: 2020.07.31 12:03:22 -04'00'

The Honorable Michael S. Nachmanoff
United States Magistrate Judge